## FREEMAN v. BELINOSKI.

(Court of Civil Appeals of Texas. Galveston. Dec. 18, 1912.)

1. RAILROADS (§ 400*)—INJURIES ON TRACK—JURY QUESTION—NEGLIGENCE.

Evidence, in an action for the death of plaintiff's husband by being struck by defendant's passenger train while lying on the track, *held* to raise the issue of negligence in failing to use due care to stop the train, and avoid striking decedent after his peril was discovered.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1365–1381; Dec. Dig. § 400.*]

2. TRIAL (§ 194*) — INSTRUCTIONS — WEIGHT OF EVIDENCE.

An instruction in an action for death on defendant's railroad track that as to whether the persons operating the engine discovered decedent's peril, and, when they discovered his peril, if they did so, as to whether they used all means at their command, if any, consistent with the train's safety, to avoid injury after they discovered his peril, if they did so, "may be shown by circumstances, and same must be determined by circumstances at the time," was not on the weight of the evidence, as excluding consideration of the trainmen's testimony.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 439–441, 446–454, 456–466; Dec. Dig. § 194.*]

3. RAILROADS (§ 400*)—INJURIES ON TRACKS—EVIDENCE—CAUSE OF DEATH.

Evidence in an action for decedent's death by being run over while lying on a railroad track in connection with the presumption that a man will not take his own life *held* to make it a jury question whether decedent suicided.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1365–1381; Dec. Dig. § 400.*]

Appeal from District Court, Walker County; S. W. Dean, Judge.

Action by Mary Belinoski against T. J.

Freeman, receiver. From a judgment for plaintiff, defendant appeals. Affirmed.

Wilson & Dabney, of Houston, and Dean, Humphrey & Powell, of Huntsville, for appellant. Hill & Elkins, of Huntsville, for appellee.

McMEANS, J. Joseph L. Belinoski was killed on the track of the International & Great Northern Railroad by being struck by a passenger train operated by the servants of T. J. Freeman, who was then in charge of and operating said railroad as receiver. Mrs. Joseph Belinoski, the widow, and J. F. Belinoski and Mary Belinoski, the father and mother of the deceased, brought this suit against the receiver to recover damages for the death of said Joseph L. Belinoski. Plaintiffs alleged that while the said Joseph L. Belinoski was upon the track "he was overcome and stricken and rendered helpless and was prostrated upon the track of defendant, and that while lying prostrated upon said track, and in said helpless condition, the defendant, his agents and servants, negligently ran a passenger train over and against him, and killed him." They further alleged that the agents and servants of defendant operating said passenger train discovered the deceased and his dangerous situation and realized his peril in time, by the use of the means at hand, to have stopped the train, and thereby avoided striking him, but that they negligently failed to make use of such means, and that by reason thereof the deceased was struck and killed. Defendant pleaded contributory negligence of the deceased, and, further, that deceased placed himself upon the track with the intent to commit suicide by allowing defendant's train to run over him, and further pleaded that it was impossible for the operatives of the train after they discovered the deceased upon the track and realized his peril to stop the train by the use of the means at their command before it ran upon and killed him. A trial before a jury resulted in a verdict and judgment for plaintiff Mrs. Joseph L. Belinoski, the widow, against the defendant for the sum of $5,000, and a judgment in favor of defendant and against J. F. Belinoski and Mary Belinoski, the father and mother of the deceased. From the judgment against him, the receiver, after his motion for a new trial had been overruled, has appealed.

Joseph L. Belinoski was killed near Alonzo switch, about a mile and a half south of New Waverly, in Walker county. The railroad track at this point runs practically north and south. Deceased was lying upon the ground, his feet and body outside of the track, and on the east side of the east rail, his right arm resting upon the east rail, and his head resting upon his arm. His face was turned toward the south. His head was severed by the engine drawing the train which struck him, and the wrist of his right arm was badly lacerated. The track a short distance after leaving New Waverly, running south, runs around a curve, then downgrade, for a short distance, the lowest part of the grade being called a "dip" in the track, then ascends from the dip on a grade of about $2/10$ of 1 per cent. for a distance of 1,500 or 1,600 feet, to the crest of a hill, and there descends again to the section house near Alonzo switch on a grade of about 1 per cent. By a "1 per cent. grade" is meant one foot to each 100 feet, which is practically 52 feet to the mile. The track from where it left the curve south of New Waverly to the crest of the next hill is straight, and there was nothing to obscure the vision of the train operatives or prevent them seeing a person on the track between the curve and the crest of the hill. The distance from the curve to the crest is 2,400 feet. There is some dispute in the evidence as to whether Belinoski was lying to the north or to the south of the crest, but there was evidence which justified the jury in finding that he was just a short distance north of the crest, and in deference to the verdict we so find. The passenger train going south on that day was about an hour behind time, and, when it came through the curve, was running at the speed of 48 or 50 miles per hour. The fireman and engineer testified that, when they emerged from the curve, they looked down the track, but saw no one nor any obstruction upon it, but, after passing the dip and when within about 200 yards of Belinoski, they discovered something upon the east rail, and the fireman says he saw it was a man, and took him to be a section hand "lining up" the track, and thought from his position he was "sighting" up it. He testified that he at once rang the bell to notify the man of the approach of the train, but as the deceased did not move he called to the engineer that there was a man on the track, and that the engineer at once sounded an alarm by giving several short blasts of the whistle, and at once applied the emergency brakes, but it was too late to stop the train before it struck and killed the deceased. The engineer testified that he was about 100 yards from the deceased when he realized that the object he saw was a man, and also testified to his sounding the whistle and applying the emergency brakes. It was shown by all the testimony on the point that but one series of blasts was given by the whistle. Testimony introduced by the defendant showed that a passenger train such as the one in question and equipped with brakes as it was, running at a speed of 50 miles per hour on a straight and level track, could not be stopped at a less distance than 1,500 or 1,600 feet. On the other hand, it was proved by a witness introduced by plaintiff that such a train so equipped and traveling at such a speed and on such a track could have been stopped in a distance of 600 or 635 feet. All the witnesses agreed that a train going up a slight grade could be stopped in a shorter distance than upon a level track. Three persons who

were passengers on the train were called as witnesses. One of these, Codger Bukowski, testified that he heard the alarm blasts of the whistle, and that these were given before the train reached the dip. As before shown, the dip was 1,500 feet from the point where Belinoski was lying. The two other passengers testified that there was no sudden stopping of the train, and that there was no appreciable diminution of its speed until after Belinoski was struck, and that the stop made by the train was gradual and such as is made in the approach to and stopping at any station along the road. The uncontradicted evidence shows that the train did not come to a stop until it had run about 2,000 feet after it struck Belinoski. It must be borne in mind, however, that the track, after passing the crest of the hill, was on a descending grade of about 1 per cent. Certain tests were made to ascertain at what distance an object on the rail at the place where the deceased was lying could be seen and recognized as a human being by persons looking down the track in the direction the train was going. In making the test a man laid down on the ground, placing himself in the same position as that occupied by the deceased, and the witnesses testified that they could see him and distinguish him as a man at various distances; the furthest being 1,800 feet.

The foregoing facts were sufficient to justify the jury in finding that Belinoski was lying at a point a short distance north of the crest of a hill; that he could have been seen by the engineer and fireman and recognized as a human being at a distance of 1,800 feet; that he was, in fact, seen and his danger realized by the operatives, and that a series of blasts was given with the whistle to warn him; that this alarm was given before the train reached the dip in the track, and that the dip was 1,500 feet from the point where the deceased was lying; that the train on the upgrade from the dip to the crest of the hill could have been stopped in a distance slightly less than 1,500 feet; that there was no appreciable lessening of the speed of the train up to the time the deceased was struck; and that the train ran 2,000 feet after striking him.

[1] We conclude that the evidence sufficiently raised the issue of negligence of the servants of defendant in failing to use the care required of them by law to stop the train and avoid striking the deceased after his peril was discovered by them, and appellant's third, fourth, fifth, sixth, and seventh assignments of error questioning the sufficiency of the evidence to justify the verdict and judgment must be overruled.

[2] By his first assignment of error appellant complains of the following portion of the court's general charge to the jury: "You are further charged that as to whether the persons operating said engine discovered the peril of Joseph Belinoski, and when they dis-covered his peril, if they did so, as to whether they used all the means at their command, if any, consistent with the safety of the train, to avoid injury, after they discovered his peril, if they did so, may be shown by circumstances, and same must be determined by circumstances at the time." The objection to this charge is that it is on the weight of the evidence. To this we cannot agree. Identically the same charge was given in International & Great Northern Railroad Co. v. Munn, 46 Tex. Civ. App. 276, 102 S. W. 442, a case that involved the issue of discovered peril, and it was there held by this court that the charge was not designed to confine the investigation of the issue to the circumstances alone to the exclusion of the engineer's testimony, but was manifestly intended to confine the jury, in so far as they should consider circumstantial evidence in resolving the issue, to the circumstances existent at the time of the accident or immediately preceding or attending it. A writ of error was denied in that case. The assignment is overruled.

[3] By his second assignment of error appellant complains that the verdict of the jury is contrary to the evidence, in that the evidence shows that the deceased willfully placed himself upon the railroad track with the intention and purpose of having the train run over and kill him, and therefore it was the duty of the jury to return a verdict in his favor.

The substance of the evidence upon which appellant relies to sustain his theory that the deceased went upon the track with the intention of allowing the train to kill him is as follows: Mrs. Belinoski testified that the day before her husband was killed she, accompanied by her sister, went to her father's home, some 5½ miles distant; that her husband did not want to go with her, saying he wanted to stay at home; that he would not let her have the horses, so she walked; that she could have ridden if she had wanted to. The deceased lived near the railroad, and there was a well-defined path from his house to the track. The track was frequently used by himself and others as a walkway. About 9 or 10 o'clock in the morning of the day of the killing, he was seen coming onto the right of way over steps placed on each side of the right of way fence. Soon afterwards he was seen sitting on the end of a cross-tie on the west side of the track. A little after 12 o'clock he was seen again coming back onto the right of way and a short while after this he was seen sitting on the end of a cross-tie on the east side of the track. When he was seen to enter upon the track the second time, he looked up and down the track, and then "dropped his head," as the witness expressed it. He was struck and killed near 1 o'clock. We think this testimony falls far short of proving that the deceased went upon the track intent on self-destruction. Conceding, however, that it

raised the issue, and we hardly think it did when considered in connection with the presumption that a man will not take his own life (Insurance Co. v. McConkey, 127 U. S. 661, 8 Sup. Ct. 1360, 32 L. Ed. 308), yet, nevertheless, the court by an appropriate charge submitted the issue to the jury, and the jury resolved that issue against appellant. Clearly the evidence on this issue is not such that it can be said that it established as a matter of law that Belinoski died the death of a suicide. By discussing this assignment as we have, we do not mean to be understood to hold that even if Belinoski went upon the track to be killed, and met his death as the result thereof, the defendant could escape liability therefor if his servants operating said train discovered him and realized his peril in time by the use of the means at hand to have stopped the train and avoided striking him, and failed to use the care required by law to so avoid hitting him. The assignment is overruled.

The eighth, ninth, tenth, and eleventh assignments complain in different forms that the verdict of $5,000 in favor of Mrs. Belinoski is excessive. We think that all that need be said in disposing of these assignments is that we have carefully examined the evidence in the record bearing on this issue, and are of the opinion that the jury was warranted therefrom in fixing her damages in the amount of the award. Certainly the verdict is not so excessive as to indicate that the jury were actuated by sympathy, prejudice, or some other improper motive. Clearly it is not so excessive as to justify this court in substituting its judgment for that of the jury as to the amount of damages the plaintiff sustained by reason of the death of her husband.

We find no reversible error in the record, and the judgment of the court below is in all things affirmed.

Affirmed.